UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

MARSHALL VANDERMARK, *et al.*,

Plaintiffs,

- against -

CITY OF NEW YORK, DEPARTMENT
OF ENVIRONMENTAL PROTECTION,
WATER BOARD FOR NEW YORK
CITY, MICHAEL BLOOMBERG, Mayor,
EMILY LLOYD, Commissioner,
EDWARD WELCH, Chief, JAMES
GOLDEN, President of Local 300, SEIU,
and LOCAL 300, SEIU,

Defendants.

------------------------------------------------------ X

**OPINION & ORDER**

**08 Civ. 5332(SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/4/09

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

Approximately 130 Environmental Police Officers ("EPOs")

employed by the New York City Department of Environmental Protection

("DEP") – along with the Law Enforcement Employees Benevolent Association

("LEEBA") – assert that the City of New York, city agencies, city employees

(collectively "City defendants"), Local 300 of the Service Employees International

Union ("Local 300" or "SEIU") and the Local 300' s president (collectively "SEIU defendants") engaged in a broad array of unlawful conduct, including failure to provide proper overtime compensation, discrimination, and corrupt business practices. Plaintiffs allege that defendants have violated the Fair Labor Standards Act ("FLSA"),[1] Title VII of the Civil Rights Act of 1964 ("Title VII"),[2] the Civil Rights Act of 1866 ("Section 1981"),[3] the Age Discrimination in Employment Act ("ADEA"),[4] Section One of the Civil Rights Act of 1871 ("Section 1983"),[5] Section Two of the Civil Rights Act of 1871 ("Section 1985"),[6] the Racketeer Influenced and Corrupt Organizations Act ("RICO"),[7] the Labor Management Relations Act ("LMRA"),[8] the Employee Retirement Income Security Act

---

[1]   29 U.S.C. §§ 201-219.

[2]   42 U.S.C. §§ 2000e to 2000e-17.

[3]   *Id.* § 1981.

[4]   29 U.S.C. §§ 621-634.

[5]   42 U.S.C. § 1983.

[6]   *Id.* § 1985(3).

[7]   18 U.S.C. §§ 1961-1968.

[8]   29 U.S.C. §§ 183-197.

("ERISA"),[9] the Clean Water Act of 1977 ("CWA"),[10] the First and Fourteenth Amendments to the United States Constitution, the New York Human Rights Law,[11] the New York Civil Service Law,[12] and Article V, Section 6 of the New York Constitution.

Defendants now move to dismiss this action in its entirety. The Court has received separate motions from the City defendants and the SEIU defendants. For the reasons that follow, defendants' motions to dismiss are granted in full.

## II. BACKGROUND[13]

### A. Claims

Plaintiffs filed their initial Complaint on June 11, 2008, an Amended Complaint on October 14, 2008, and the operative Second Amended Complaint on

---

[9] *Id.* §§ 1001-1461.

[10] 33 U.S.C. §§ 1241-1387.

[11] N.Y. Exec. Law §§ 8-101 to 8-703.

[12] N.Y. Civil Service Law §§ 1-214.

[13] The facts recited here are drawn solely from plaintiffs' Second Amended Complaint. Although plaintiffs submitted additional affidavits in response to defendants' motions to dismiss – in an attempt to remedy some of the most glaring deficiencies in the Complaint – "'when matters outside the pleadings are presented in response to a 12(b)(6) motion[] the court may exclude the additional material and decide the motion on the complaint alone.'" *Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir. 1991) (quoting *Fonte v. Board of Managers*, 848 F.2d 24, 25 (2d Cir. 1988)).

December 8, 2008.  Although the Complaint is exceedingly difficult to follow,

plaintiffs allege that defendants have harmed them in the following ways:[14] (1) by

insufficiently compensating them for overtime by applying FLSA guidelines

applicable to law enforcement employees,[15] (2) by creating a hostile work

environment in violation of Title VII through a panoply of objectionable working

conditions;[16] (3) by discriminating against them plaintiffs in violation of Title VII,

the ADEA, Section 1981, the Equal Protection Clause, the New York Human

Rights Law, and the New York Civil Service Law;[17] (4) by reducing

environmental monitoring of New York City's water supply in violation of RICO

in order to avoid filtration costs necessitated by compliance with the CWA;[18] (5)

by failing to provide them with sufficient compensation and benefits in violation

---

[14]    The claims are not clearly stated.  What follows is the Court's best
attempt to discern the meaning of plaintiffs' allegations.  I cannot be sure that I
have precisely stated plaintiffs' intended claims.

[15]    *See* Second Amended Complaint for Money Damages, Declaratory
and Injunctive Relief ("Second Am. Complaint") ¶¶ 63-94.

[16]    *See id.* ¶¶ 95-131.

[17]    *See id.* ¶¶ 132-178.

[18]    *See id.* ¶¶ 179-235.

of the CWA;[19] (6) by failing to provide them with sufficient compensation and

benefits in violation of the New York Executive Law and New York State

Constitution;[20] and (7) by failing to transfer to LEEBA funds held in trust for

EPOs in violation of ERISA, the LMRA, and contractual provisions.[21]  Plaintiffs

additionally assert – although not under the heading of a distinct claim – that the

SEIU defendants have violated plaintiffs' First Amendment freedom of association

rights by failing to transfer funds related to benefits from SEIU Local 300 to

LEEBA.[22]

### B.    EPO Job Description and Benefits

EPOs are law enforcement officers charged with protecting the

upstate watershed that supplies New York City with potable water.[23]  Pursuant to

the New York State Criminal Procedure Law, EPOs are "police officers" with the

---

[19]    *See id.* ¶¶ 236-248.  Although it is possible that plaintiffs intended to
include allegations concerning substandard filtration at certain wastewater plants
in their CWA claim, *see, e.g., id.* ¶ 101, these allegations are not included under
the heading of plaintiffs' CWA claim.  Nor would the inclusion of these additional
assertions affect this Court's analysis.

[20]    *See id.* ¶¶ 249-251.

[21]    *See id.* ¶¶ 252-263.  *See also id.* ¶ 230 (asserting that the failure to
transfer assets violated the LMRA).

[22]    *See id.* ¶ 151.

[23]    *See id.* ¶¶ 22-24.

power to arrest.[24]  EPOs are also periodically called to provide supplemental

support to the New York City Police Department ("NYPD") during manpower

shortages such as the 2004 Republican National Convention and the aftermath of

the terrorist attacks of September 11, 2001.[25]  EPOs are subject to the same hiring

qualifications as NYPD officers, including graduation from a certified police

academy.[26]

Despite similar initial qualifications, EPOs do not receive the same

compensation and benefits as NYPD officers.  Specifically, EPOs receive lower

pay and reduced benefits, and they are not given full paid sick leave for the

duration of line of duty injuries.[27]  Moreover, the collective bargaining agreement

("CBA") between the City of New York and the EPOs does not provide for

retirement after twenty years of service with full benefits, although NYPD officers

receive this benefit.[28]  In addition, DEP does not utilize a merit, fitness, and

---

[24]     *Id.* ¶¶ 18, 28, 32, 66.  *Accord* N.Y. Crim. Proc. Law § 1.20(34)(o).

[25]     *See* Second Am. Complaint ¶¶ 31, 73.

[26]     *See id.* ¶¶ 78-80.

[27]     *See id.* ¶ 79.

[28]     *See id.*

competitive examination process to promote individual EPOs.[29]  Finally, although

pregnant members of the NYPD may receive paid time off or light duty, light duty

assignments are unavailable to pregnant female EPOs "during certain trimesters of

pregnancy."[30]

On the other hand, EPO overtime benefits are calculated using the

FLSA rubric applied to law enforcement officers, providing premium

compensation only after an EPO has worked more than 171 hours in a twenty-

eight day work period.[31]  In the aftermath of the September 11 terrorist attacks,

EPOs were paid overtime for each hour worked beyond their ordinary work

schedule, but after the clean-up was complete, DEP returned to the pre-existing

overtime compensation system.[32]

## C.    DEP Cost Saving Measures

On some unspecified date, DEP contracted with FJC Security, Inc. to

use private guards to monitor watershed areas previously patrolled by EPOs.[33]

---

[29]    *See id.* ¶¶ 90-91.

[30]    *Id.* ¶¶ 87, 158.

[31]    *See id.* ¶ 51.

[32]    *See id.* ¶ 73.

[33]    *See id.* ¶¶ 68-69.

These guards lacked the specific training – as well as the enforcement powers – of EPOs.[34]  Moreover, DEP installed cameras at numerous locations to reduce the need for in-person patrols and grounded observation flights.[35]  Around this same time, DEP reduced the number of EPOs from 201 to 188.[36]

### D.    EPO Union Representation

For approximately twenty-five years, EPOs were represented by SEIU Local 300 for the purpose of negotiating a CBA with the City of New York.[37]  Local 300 represents a number of clerical workers employed by the City, including Fingerprint Technicians, Mortuary Technicians, Elevator Starters, Window Cleaners, Assistant Purchasing Agents, and Auditors.[38]  However, the SEIU negotiated a unique CBA for EPOs that has been in effect since March 13, 2000.[39]

On November 20, 2005, EPOs unanimously voted to certify LEEBA

---

[34]    *See id.*

[35]    *See id.* ¶¶ 191, 195.

[36]    *See id.* ¶ 187.

[37]    *See id.* ¶¶ 14, 33.

[38]    *See id.* ¶ 33.

[39]    *See id.* ¶¶ 49-51.

as their new collective bargaining agent.[40]  Although LEEBA has conducted initial

negotiations with the City concerning a new CBA, the parties have not reached a

new agreement.[41]  LEEBA has protested the contract distinctions between EPOs

and NYPD officers, as well as the provision of the New York City Code that does

not recognize EPOs as "uniform services" given particular bargaining rights.[42]

LEEBA has additionally requested that the SEIU "account for and

transfer to LEEBA the control of welfare, annuity and retirement funds managed

by Local 300 for EPO benefit."[43]  The SEIU has allegedly failed to provide such

an accounting or to transfer such funds.[44]

### E.    The "Filtration Avoidance Plan"

In order to avoid the multi-billion dollar cost of artificial water

---

[40]    *See id.* ¶¶ 11, 149.

[41]    *See id.* ¶¶ 40-41, 50.

[42]    *See id.* ¶¶ 41-48 (quoting N.Y.C. Code § 12-307(4)).  Uniformed services protections extend to "police, fire, sanitation and correction services, or any other police officers as defined in subdivision thirty-four of section 1.20 of the criminal procedure law who is *also* defined as a police officer in" the New York City Code.  N.Y.C. Code § 12-307(4) (emphasis added).  Although EPOs have arrest powers under the New York Criminal Procedure Law, they are not defined as police officers under the City Code.  *See* Second Am. Complaint ¶ 46.

[43]    Second Am. Complaint ¶ 19.  *Accord id.* ¶ 36 (alleging that the SEIU has not made the requested transfers).

[44]    *See id.* ¶ 38

filtration, New York City depends on natural filtration of ground and surface water in the neighboring watershed. The City has deemed the effort to utilize natural filtration the "filtration avoidance plan."[45] Plaintiffs have alleged that "[t]o be successful, the [filtration avoidance plan] had to reduce the detection of pollution while maintaining the appearance of security for the water supply."[46] Specifically, plaintiffs have alleged that defendants reduced the number of EPOs, substituted private security guards, used remote cameras, and reduced other surveillance activities – as well as kept in place a compensation scheme that led to high attrition rates among EPOs – in order to "cover up environmental hazards."[47] Moreover, plaintiffs allege that defendants Bloomberg, Lloyd, and Welch knew that numerous wastewater treatment plants were emitting unacceptable levels of pollutants but allowed both ongoing violations and the falsification of discharge reports in order to avoid the cost of artificial filtration.[48] Plaintiffs allege that defendants have benefitted from this scheme through the "billions of dollars collected for water supplied" to residents of New York City and the surrounding

---

45      *See id.* ¶¶ 180-182.

46      *Id.* ¶ 184.

47      *Id.* ¶¶ 185-197.

48      *See id.* ¶¶ 207-212.

counties.[49]

## III.   APPLICABLE LAW

### A.   Motion to Dismiss

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, a court must "'accept as true all of the factual

allegations contained in the complaint'"[50] and "draw all reasonable inferences in

the plaintiff's favor."[51]   A complaint must provide "the grounds upon which [the

plaintiff's] claim rests through factual allegations sufficient 'to raise a right to

relief above the speculative level'"[52] in order to survive a motion to dismiss.

Although the complaint need not provide "detailed factual allegations,"[53] it must

nonetheless "amplify a claim with some factual allegations . . . to render the claim

---

[49]     *Id.* ¶ 234.

[50]     *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007)).

[51]     *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[52]     *ATSI  Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). *Accord Erickson*, 127 S. Ct. at 2200 (noting that plaintiffs must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'") (quoting *Twombly*, 550 U.S. at 555).

[53]     *Twombly*, 550 U.S. at 555.

*plausible.*[54]  "[B]ald assertions and conclusions of law will not suffice."[55]

Allegations of fraud are subject to a heightened pleading standard. Under Rule 9(b) of the Federal Rules of Civil Procedure, "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud."[56]  "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard [its] reputation from improvident charges of wrongdoing, and protect [it] against strike suits."[57]  To comply with the requirements of Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[58]  "Allegations that are conclusory or unsupported by factual assertions are insufficient."[59]

---

[54]   *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007), *cert. granted*, 128 S. Ct. 2931 (2008).

[55]   *Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) (citation omitted).

[56]   Fed. R. Civ. P. 9(b).  *Accord ATSI*, 493 F.3d at 99.

[57]   *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

[58]   *Rombach*, 355 F.3d at 170 (quotation omitted).  *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[59]   *ATSI*, 493 F.3d at 99.

**B.    The FLSA**

The FLSA generally requires that employers provide overtime compensation for any work beyond forty hours in a single workweek.[60]  However, the FLSA provides an exception for "any employee . . . in law enforcement activities," allowing premium compensation to commence only after 171 hours of work in a twenty-eight day work period.[61]  Under U.S. Department of Labor regulations,

> the term 'any employee . . . in law enforcement activities' refers to any employee (1) who is a uniformed or plainclothed member of a body of officers and subordinates who are empowered by State statute or local ordinance to enforce laws designed to maintain public peace and order and to protect both life and property from accidental or willful injury, and to prevent and detect crimes, (2) who has the power to arrest, and (3) who is presently undergoing or has undergone or will undergo on-the-job training and/or a course of instruction and study which typically includes physical training, self-defense, firearm proficiency, criminal and civil law principles, investigative and law enforcement techniques, community relations, medical aid and ethics.[62]

An employer that provides greater compensation than the FLSA mandates is not

---

[60]    *See* 29 U.S.C. § 207(a)(1).

[61]    *See id.* § 207(k)(1)(B).  *See also* 29 C.F.R. § 553.201.

[62]    29 C.F.R. § 553.211(a).

required by statute to maintain that higher level of compensation.[63]

## C.     Title VII

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful

employment practice for an employer . . . to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin."[64]

> To state a claim for a hostile work environment in violation
> of Title VII, a plaintiff must plead facts that would tend to
> show that the complained of conduct: (1) "is objectively
> severe or pervasive – that is, . . . creates an environment
> that a reasonable person would find hostile or abusive"; (2)
> creates an environment "that the plaintiff subjectively
> perceives as hostile or abusive"; and (3) "creates such an
> environment because of the plaintiff's [race, color, religion,
> sex, or national origin]."[65]

## D.     Section 1981

Section One of the Civil Rights Act of 1886 – colloquially known as

---

[63]     *See Milner v. Hazelwood*, 165 F.3d 1222, 1223 (8th Cir. 1999) (per curiam). *Cf. Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728, 740 (1981) (noting that FLSA rights exist independently of the employment contract).

[64]     42 U.S.C. § 2000e-2(a)(1).

[65]     *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)). *Accord Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001) ("Under Title VII, a hostile work environment is one form of disparate treatment on the basis of 'race, color, religion, sex, or national origin.'" (quoting 42 U.S.C. § 2000e-2(a)(1)).

Section 1981 – states in relevant part:

> All persons within the jurisdiction of the United States
> shall have the same right . . . to make and enforce
> contracts, to sue, be parties, give evidence, and to the full
> and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white
> citizens."[66]

"Only suits based on racial discrimination may be maintained under this statute."[67]

### E.   ADEA

Under the ADEA, it is "unlawful for an employer to fail or refuse to

hire or to discharge any individual or otherwise discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's age."[68]   However, a safe harbor

provision of the Older Workers' Benefit Protection Act states,

> It shall not be unlawful for an employer, employment
> agency, or labor organization to take any action otherwise
> prohibited under [the ADEA] . . . to observe the terms of a
> bona fide employee benefit plan that is a voluntary early

---

[66]   42 U.S.C. § 1981(a).

[67]   *Lee v. Bolger*, 454 F. Supp. 226, 233 (S.D.N.Y. 1978). *Accord Mian
v. Donaldson, Lufkin, & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)
(per curiam) ("To establish a claim under § 1981, a plaintiff must allege . . . [that]
the plaintiff is a member of a racial minority [and] an intent to discriminate on the
basis of race by the defendant . . . .").

[68]   29 U.S.C. § 623(a)(1).

retirement incentive plan consistent with the relevant purpose or purposes of this chapter.[69]

## F.    Section 1983

Section One of the Civil Rights Act of 1871 – colloquially known as

Section 1983 – states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.[70]

"'[O]ne cannot go into court and claim a 'violation of § 1983' – for § 1983 by

itself does not protect anyone against anything.'"[71]  However, the passage of

section 1983 "creat[ed] a civil cause of action for constitutional torts."[72]

---

[69]     *Id.* § 623(f)(2)(B)(ii).  *See also Abrahamson v. Board of Educ.*, 374 F.3d 66, 73 (2d Cir. 2004) ("An employee benefit plan that otherwise discriminates on the basis of age may still be valid under the ADEA if . . . it is a voluntary early retirement incentive under which an employer need not expend an equal amount as long as the plan is voluntary and consistent with the ADEA's goals of protecting workers from arbitrary age discrimination.").

[70]     42 U.S.C. § 1983.

[71]     *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979)).

[72]     *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004).

16

## G.    Section 1985

Section Two of the Civil Rights Act of 1871 – which now appears as

section 1985(3) of Title 42 of the United States Code – states in relevant part,

> If two or more persons . . . conspire . . . for the purpose of
> depriving . . . any person or class of persons of the equal
> protection of the laws, or of equal privileges and
> immunities under the laws . . . if one or more persons
> engaged therein do . . . any act in furtherance of the object
> of such conspiracy, whereby another is injured in his
> person or property, or deprived of having and exercising
> any right or privilege of a citizen of the United States, the
> party so injured or deprived may have an action for the
> recovery of damages.[73]

Although a Section 1985 claim does not require state action,[74] "the rights,

privileges, and immunities that § 1985(3) vindicates must be found elsewhere,"

namely within a constitutional guarantee.[75]

## H.    Equal Protection Clause

---

[73]    *Accord Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971) (breaking
the statutory text into elements); *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d
778, 791 (2d Cir. 2007).

[74]    *See Griffin*, 403 U.S. at 97.

[75]    *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 833
(1983). *Accord Cine SK8*, 507 F.3d at 791 ("A § 1985(3) 'conspiracy must also be
motivated by some racial or perhaps otherwise class-based, invidious
discriminatory animus behind the conspirators' action.'" (quoting *Thomas v.
Roach*, 165 F.3d 137, 146 (2d Cir. 1999))).

17

"The problem of legislative classification is a perennial one, admitting of no doctrinaire definition."[76] However, "[t]he prohibition of the Equal Protection Clause goes no further than . . . invidious discrimination."[77] "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."[78] "The general rule gives way, however, when a statute classifies by race, alienage, or national origin," as well as gender and illegitimacy.[79]

## I.    RICO

"[T]o establish a violation of [RICO], a plaintiff must establish that a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the

---

[76]    *Williamson v. Lee Optical*, 348 U.S. 483, 489 (1955).

[77]    *Id.*

[78]    *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (citations omitted). *Accord Yuen Jin v. Mukasey*, 538 F.3d 143, 158 (2d Cir. 2008) ("A classification subject to rational basis review 'must be upheld against [an] equal protection challenge if there is *any reasonably conceivable* state of facts that could provide a rational basis for the classification. Where there are plausible reasons for [state] action, [the] inquiry is at an end." (quoting *Federal Commc'n Comm. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993))). *Accord Domond v. U.S. INS*, 244 F.3d 81, 87 (2d Cir. 2001) ("Under this slight standard of review, the distinctions made by the government are given 'a strong presumption of validity.'" (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993))).

[79]    *City of Cleburne*, 473 U.S. at 440.

activities of which affected interstate or foreign commerce."[80] "'[R]acketeering activity' means any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . , which is chargeable under State law and punishable by imprisonment for more than one year," as well as a panoply of other specific crimes under the United States Code.[81]

### J.    CWA

The CWA creates a system to "impose limitations on the discharge of pollutants, and establish related monitoring and reporting requirements, in order to improve the cleanliness and safety of the Nation's waters."[82]  Subject to specific limitations, "any citizen may commence a civil action on his own behalf against any person including . . . any . . . governmental instrumentality or agency . . . who is alleged to be in violation of an effluent standard or limitation."[83]  One such limitation establishes that if the Administrator of the Environmental Protection

---

[80]    *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (citations omitted).

[81]    18 U.S.C. § 1962(1).

[82]    *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 174 (2000).

[83]    33 U.S.C. § 1365(a)(1).

Agency or a state has not commenced an enforcement action, "no action may be

commenced under [the citizen-suit provision] prior to sixty days after the plaintiff

has given notice of the alleged violation to the Administrator, to the State in which

the alleged violation occurs, and to any alleged violator of the standard, limitation,

or order."[84]

### K.    LMRA

The LMRA prohibits

> any employer . . . to pay, lend, or deliver, or agree to pay,
> lend, or deliver, any money or other thing of value to any
> labor organization, or any officer or employee thereof,
> which represents, seeks to represent, or would admit to
> membership, any of the employees of such employer who
> are employed in an industry affecting commerce.[85]

For the purpose of the LMRA, the term "employer" "shall not include the United

States or any wholly owned Government corporation, or any Federal Reserve

Bank, or any State or political subdivision thereof."[86]

### L.    ERISA

---

[84]    *Id.* § 1365(b)(1).

[85]    29 U.S.C. § 186(a)(2).

[86]    *Id.* § 152(2). *See also Bond v. City of Middletown*, 389 F. Supp. 2d
319, 341 (D. Conn. 2005) ("[I]t follows that [an individual employed by a
municipality] is not an 'employee' because he does not work for an 'employer.'"
(citing 29 U.S.C. § 152(3)).

Under ERISA,

> In any case in which an employer has completely or partially withdrawn from a multiemployer plan . . . as a result of a certified change of collective bargaining representative . . . if participants of the old plan who are employed by the employer will, as a result of that change, participate in another multiemployer plan . . . the old plan shall transfer assets and liabilities to the new plan [under statutorily-defined conditions].[87]

However, Title I of ERISA does "not apply to any employee benefit plan if . . . such plan is a governmental plan."[88]  "The term 'governmental plan' means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing."[89]

### M.    Freedom of Association

"The First Amendment . . . prohibits a state, as sovereign, from abridging an individual's 'right to associate with others in pursuit of a wide

---

[87]    29 U.S.C. § 1415(a).

[88]    *Id.* § 1003(b).

[89]    *Id.* § 1002(32).  *See also Roy v. Teachers' Ins. & Annuity Ass'n*, 878 F.2d 47, 49 (2d Cir. 1989) ("The governmental plan exemption embodied in section 1003(b) evinces "Congress' intent to refrain from interfering with the manner in which state and local governments operate employee benefit systems." (quoting *Feinstein v. Lewis*, 477 F. Supp. 1256, 1261 (S.D.N.Y.1979), *aff'd*, 622 F.2d 573 (2d Cir. 1980)).

variety of political, social, economic, educational, religious, and cultural ends.'"[90]

A First Amendment claim requires a showing of state action or private action

taken under the color of law.[91]

### N.   Supplemental Jurisdiction

Subject to statutory exceptions,

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.[92]

Under one such exception, "[t]he district courts may decline to exercise supplemental

jurisdiction over a claim . . . if the district court has dismissed all claims over which

it has original jurisdiction."[93]

## IV.   DISCUSSION

Plaintiffs have expressly raised seven sets of claims in the Second

---

[90]     *Piscottano v. Murphy*, 511 F.3d 247, 268 (2d Cir. 2007) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 647 (2000)).

[91]     *See, e.g.*, *Albert v. Carovano*, 851 F.2d 561, 573 (2d Cir. 1988). *Cf. Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 817 n.5 (4th Cir. 2004) ("[T]he First Amendment does not apply to private employers.").

[92]     28 U.S.C. § 1367(a).

[93]     *Id.* § 1367(c)(3).

Amended Complaint.  They in all likelihood intended to raise a Freedom of

Association claim as well.  I will address each alleged violation in turn.[94]

## A.   The FLSA Claim

Plaintiffs argue that defendants are barred from applying the FLSA

overtime framework applicable to employees "in law enforcement activities" to

EPOs because EPOs are not recognized under New York municipal law as

members of a "uniformed service."[95]  These terms have entirely distinct meanings,

as uniform services encompasses numerous categories of employees not engaged

in law enforcement activities, such as garbage collectors.  More importantly, an

---

[94]   Plaintiffs make reference to a claim under the Equal Pay Act in their memorandum in opposition to the City defendants' motion to dismiss.  *See* Memorandum of Law in Opposition to Motion by City of New York, Department of Environmental Protection, Water Board for New York City, Mayor Bloomberg, Commissioner Emily Lloyd, Chief, Edward Welch ("Pl. City Mem.") at 5 (citing 29 U.S.C. § 206).  However, this claim is not raised in the Complaint, and plaintiffs may not ambush defendants with new claims after defendants have moved to dismiss.  As a result, I will not address any claim under the Equal Pay Act.  Nor – upon cursory examination – would such a claim be viable, as the Equal Pay Act addresses only sex-based discrimination.  *See* 29 U.S.C. § 206(d).

[95]   Plaintiffs claim that a number of defendants' other actions violate the FLSA.  *See, e.g.*, Second Am. Complaint ¶ 65 (alleging that "[w]here Defendants[] NYC, DEP, Mayor Bloomberg, Commissioner Lloyd, and Local 300  have continually suppressed the right of EPOs to be recognized as police officers in collective bargaining they have violated terms and conditions in the FLSA").  However, plaintiffs fail to identify any particular statutory provision violated by such acts.  Nor do the actions named appear to violate any provision of the FLSA.

employee's qualification for the overtime rules applicable only to employees participating "in law enforcement activities" is established by the employee's duties, rather than the text of a local law or contract.

The EPOs fit the three-part definition of an employee in law enforcement activities established by Department of Labor regulations. Specifically, EPOS are members of a body of officers empowered by law to enforce environmental laws, to protect life and property, and to prevent and detect environmental crimes. They are specifically empowered to make arrests by the New York Criminal Procedure Law, and they undergo specific training in a certified police academy. Because of the characteristics that plaintiffs assert are necessary to protect the watershed – characteristics that private security guards lack – EPOs may be subject to the overtime scheme applicable to law enforcement officers.

As a secondary argument, plaintiffs assert that defendants' decision to provide enhanced overtime compensation in the aftermath of the September 11 terrorist attacks bars the City from later limiting overtime compensation to the statutory minimum. However, the FLSA is a fixed floor, not a ratchet. After September 11, the City of New York most likely recognized the tremendous sacrifices being made by law enforcement officers – including EPOs – and

24

decided to provide supplemental compensation, regardless of FLSA requirements. If the FLSA mandated that an employer could not return to base compensation levels, it would deter employers from providing emergency pay, hazard pay, or profit-sharing bonuses. There is no basis for this position in either the statutory text or caselaw. Therefore, plaintiffs' FLSA claims are dismissed.

**B.     The Hostile Work Environment Claim**

Plaintiffs next claim that the circumstances of their employment create a "hostile work environment" in violation of Title VII. Although plaintiffs have seized upon the phrase "hostile work environment," they fail to recognize that Title VII claims are predicated on discrimination on one of several enumerated bases. A hostile work environment claim requires proof that a defendants creates such an environment because of the plaintiff's race, color, religion, sex, or national origin. No such allegations are offered here. The mere allegation of hostility is not enough. Therefore, plaintiffs' Title VII hostile work environment claim is dismissed.

**C.     The Discrimination Claims**

Plaintiffs claim that they are subject to unlawful discrimination on the

basis of their status as EPOs rather than members of the NYPD.[96]  First and most

simply, the alleged discrimination is not based on race.  Therefore plaintiffs have

no claim under Section 1981.  Nor is the alleged discrimination based on color,

religion, sex, or national origin.  Therefore plaintiffs have no claim under Title

VII.  Finally, the alleged discrimination is not based on age.  Therefore plaintiffs

have no claim under the ADEA.[97]

            Plaintiffs' Section 1983 and Section 1985 claims also lack merit.

Both claims are predicated on a violation of plaintiffs' rights under the Equal

Protection Clause.  "Equal protection of the laws"[98] does not mean that the

government may never distinguish between groups of individuals.  Given that the

---

[96]        Although defendants characterize these allegations as a "Class of
One" claim, *see* City Defendants' Memorandum of Law in Support of Their
Motion to Dismiss the Second Amended Complaint at 11-12, plaintiffs reject this
characterization and identify the "class" as "a police force commanded to protect
the public." Pl. City Mem. at 23.  Although plaintiffs present a category-based
claim, avoiding the bar on class-of-one claims in the public employment context,
*see Engquist v. Oregon Dep't of Agric.*, 128 S. Ct. 2146 (2008), the result remains
the same.

[97]        Although EPOs do not receive the same generous retirement plan
offered to NYPD officers, the distinction between the two groups remains one of
position, rather than age.  The ADEA does not grant an employee a right to a full
pension after twenty years of employment, even if the employer provides such a
pension to other employees.

[98]        U.S. Const. amend. XIV, § 1.

26

contract distinctions between EPOs and NYPD officers rests on neither a suspect

nor a quasi-suspect classification, this Court need only identify a rational relation

between the distinction and a legitimate state interest.  There are numerous

reasonable bases on which the City of New York might decide that NYPD officers

and EPOs should receive different compensation and benefits, including the

danger associated with the positions, the physical strain of the job, and the cost of

living in the areas in which NYPD officers and EPOs work.  Defendants have

neither deprived EPOs of constitutional rights under the Equal Protection Clause,

nor have they conspired to do so; therefore, plaintiffs' Section 1983 and Section

1985 claims are dismissed.

### D.     The RICO Claim

Plaintiffs next claim that the sum of their allegations constitute a

massive RICO conspiracy among all named defendants.  However, drawing the

alleged facts solely from the Complaint, plaintiffs have failed to allege anything

approaching racketeering.  Racketeering is far more than simple illegality.

Alleged civil violations of the FLSA do not amount to racketeering.  Nor is hiring

inadequate security staff to police a watershed racketeering, even if defendants

replaced EPOs with the express purpose of avoiding detection of CWA violations.

Plaintiffs' conclusory legal pleadings best summarize the deficiency

27

of their pleadings. The Complaint states, "Defendants Bloomberg, Lloyd, Welch

and Golden engaged in a pattern of racketeering activity in connection with an

elaborate plan . . . to violate Federal Law and each defendant committed two or

more acts in violation of the Federal Clean Water Act."[99]  However – like

plaintiffs' other allegations – a violation of the CWA is not a racketeering activity.

Therefore plaintiffs' RICO claim is dismissed.

### E.    The CWA Claim

Plaintiffs next allege that defendants conspired to violate the CWA.

However, plaintiffs did not provide notice to the Environmental Protection

Agency, the State of New York, and the defendants of their CWA claim prior to

filing suit. As the plaintiffs have failed to comply with the express pre-suit

requirement of the CWA's citizen-suit provision, their CWA claim must be

dismissed.

### F.    The Constructive Trust Claim

Plaintiffs next assert that this Court must establish a constructive trust

---

[99]     Second Am. Complaint ¶ 199. The only argument found in plaintiffs'
briefs concerning RICO is the statement – without citation – that "[c]onspiracy to
violate the CWA is a valid RICO claim asserted in this action." Pl. City Mem. at
20. Plaintiffs mention RICO only one other time, to state what paragraphs of the
complaint refer to their claim. *See* Memorandum of Law in Opposition to
Defendants: James Golden & SEIU Local 300 Motion to Dismiss Second
Amended Complaint at 8.

over EPO pension funds held by the SEIU. The federal bases for the constructive

trust claim are alleged violations of the LMRA and ERISA. However, neither

statute applies to defendants. The LMRA does not address relationships between

government employers and labor organizations.[100] Along similar lines, ERISA

does not apply to governmental plans, and the funds at issue in this case are

undoubtedly part of a "a plan established . . . for its employees . . . by the

government of any State or political subdivision thereof."[101] Therefore, plaintiffs

have no claim under federal law concerning pension funds held by the SEIU.

### G.   The Freedom of Association Claim

Plaintiffs also seem to assert a claim against the SEIU defendants for

violating plaintiffs' right of Freedom of Association by failing to account and to

transfer funds held in trust for EPOs. However, plaintiffs have failed to plead that

the SEIU defendants acted under color of law in undertaking these activities. The

First Amendment does not provide a right to be free from restrictions on speech

and association imposed by private actors. For that reason alone, plaintiffs'

freedom of association claim fails.

---

[100]   Alternatively, plaintiffs have failed to provide factual allegations
sufficient to render their allegations of bribery between the City defendants and
the SEIU defendants plausible.

[101]   29 U.S.C. § 1002(32).

## H.   The State Law Claims

As no federal claims remain, this Court declines to exercise supplemental jurisdiction to address plaintiffs' state law claims, including claims under the New York Human Rights Law, the New York Civil Service Law, and Article V, Section 6 of the New York Constitution.   Therefore, these claims are dismissed for lack of subject matter jurisdiction.   Should plaintiffs wish to pursue these claims, they may do so in state court.

## V.   CONCLUSION

This Court has been asked to winnow plaintiffs' prolix and disordered Complaint and found no wheat among the chaff.[102]  For the foregoing reasons defendants' motions to dismiss are granted in their entirety.   The Clerk of the Court is directed to close these motions (Docket Nos. 26 and 29).   As plaintiffs have stipulated that they will not file a Third Amended Complaint,[103] the Clerk of the Court is directed to close this case.

---

[102]    Plaintiffs' counsel is cautioned to use greater care before filing a similar array of claims in future actions.  *See* Fed. R. Civ. P. 11(b)(2).

[103]    *See* 12/1/08 Stipulation, Docket No. 20, ¶ 2.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 4, 2009

## - Appearances -

**For Plaintiffs:**

Richard Merritt, Esq.
Law Office of Richard Merritt
2 Birs Avenue
Lindenhurst, New York 11757
(631) 412-5526

**For City Defendants:**

Donna Anne Canfield, Esq.
New York City Law Department
100 Church Street, Room 2-305
New York, New York 10007
(212) 788-8703

**For SEIU Defendants:**

Joel Spivak, Esq.
The Law Firm of Joel Spivak
98 Cutter Mill Road, Suite 310N
Great Neck, New York 11021
(516) 829-3939

Arthur J. DiBerardino, Esq.
Mirkin & Gordon, P.C
98 Cutter Mill Road, Suite 310N
Great Neck, New York 11021
(516) 466-6030